[No. S006938. Dec. 7, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS DUANE WEBB, Defendant and Appellant.

502

---

**COUNSEL**

Harry M. Caldwell and Anthony Miller, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson, Susan Lee Frierson, Cindy M. Lopez and Carol Frederick Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BAXTER, J.—Defendant Dennis Duane Webb was convicted by a jury of two counts of first degree murder (Pen. Code, § 187),[1] one count of robbery (§ 211), and one count of burglary (§ 459). The jury found that defendant personally used a firearm in the commission of each offense (§§ 12022.5, 1203.06). Under the 1978 death penalty law (defendant was sentenced to death), three special circumstances were found true—multiple murder, robbery-murder, and burglary-murder (§ 190.2, subd. (a)(3), (17)(i) & (17)(vii)).

We find no prejudicial error at the guilt or penalty phases of defendant's trial. The judgment will be affirmed in its entirety.

### I. GUILT PHASE EVIDENCE

#### A. *Prosecution Case*

The victims, John and Lori Rainwater, were a young married couple who lived in and managed an apartment complex in the city of Atascadero, San Luis Obispo County. On February 5, 1987, the day of the murders, the couple had a 15-month-old daughter and a week-old son.

The Rainwaters were last seen alive by a neighbor, Tim Clyde, about 9:45 p.m. on February 4. Clyde approached the complex from a phone booth nearby and saw John and Lori standing with a large man in the beam of the porch light at their front door. Clyde noticed that Lori had an unusual "frown" on her face, but he did not see the face of the large man. Clyde was certain, however, that he was at least 6 feet tall and weighed 200 to 220 pounds. Defendant fits this general description. As explained further below, he met the victims shortly before the crimes while searching for rental housing.

About 6 a.m. on February 5, eight hours after the incident described by Clyde, residents of the complex were awakened by screams and gunshots. On a walkway outside the units, Lori was found lying face down and dead in

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

a pool of blood. She was nude and had been shot once in the head at point-blank range. Her two children were found pinned underneath her body, essentially unharmed. Neighbors discovered John's dead body elsewhere on the grounds. He was also nude, and gunshot wounds had been inflicted at close range to his head and chest. A trail of blood led from the Rainwaters' apartment to the spot where each body was found.

The condition of the victims' bodies suggested they had been held captive for some time before their deaths. A nylon stocking was tied as a gag through each victim's mouth. On John, the stocking ran down his back and was wrapped around his hands, which were tied behind him with a cloth belt. Another stocking was tied around one of John's ankles, and one of Lori's wrists was similarly bound. Ligature marks were found on the victims' unbound wrists and ankles. The autopsy physician opined that some of the bindings had been present for "at least several hours" before death. In addition, residue consistent with adhesive tape was found on the back of John's arms and neck.

There was evidence the Rainwaters had been beaten during the ordeal. The autopsy disclosed several deep, blunt force lacerations on each victim's scalp. Miscellaneous abrasions and bruises were found on both bodies. Lori's thighs were smeared with blood.

A foreign pubic hair was found on Lori's vulva (external genitalia). The two prosecution experts who examined the hair did not find it to be consistent with sample hairs taken from Lori's husband or from defendant.

Two .38-caliber bullets of an uncommon variety described further below were recovered from John's body. (The bullet that killed Lori was not recovered.)

When authorities arrived shortly after the shootings, the Rainwaters' bed was burning. Expert testimony indicated that the fire burned for only a few minutes and could have been intentionally set.

The apartment was in disarray and the victims' blood was spattered on many surfaces. The following items were seized: a roll and several yards of used duct tape; a label for "Shurtape Cloth Tape, K-Mart, $3.97;" two makeshift "mittens" made from socks wrapped with duct tape; a tan ski

jacket bearing a Sears label; a pack of Camel Light cigarettes found inside a pocket of the jacket; and a Camel Light cigarette butt found in the bed.[2]

Investigators discovered a total of $307 in various places in the apartment.[3] However, other money belonging to the victims appeared to be missing.[4]

Defendant's activities during the relevant time period were described in large part by his girlfriend, Sharon White Bear. Sharon testified that a month or so before the crimes, defendant moved from Utah to San Luis Obispo County to be near her.[5] Sharon lived in the town of Paso Robles, and defendant initially rented a motel room on a weekly basis in nearby Atascadero. He worked for low hourly wages at a local construction site, and soon started searching for more affordable housing in the same area.

Because of a vacancy sign out front, defendant and Sharon visited the Rainwaters' complex four different times in the three weeks preceding the crimes. A resident of the complex testified that he directed them to the Rainwaters' unit on one of these occasions. According to Sharon, defendant

[2]The Rainwaters did not smoke and they did not allow visitors to smoke in the apartment. However, defendant commonly smoked the type of cigarettes found at the scene.

[3]An envelope containing $22 and marked "chapel" was found among other items on the bedroom dresser. Almost $50 was found in Lori's purse, which was sitting on the coffee table in the living room. There was also $235 in an envelope marked "Jack Emerich #1," which was found underneath some papers in a living room drawer.

[4]Money from several possible sources was never accounted for. First, investigators found a scorched greeting card but not the six $20 bills which a family friend, Rita Fernandez, had enclosed inside and given to the Rainwaters while visiting their apartment on February 3, the day before the crimes.

Second, Lori's mother, Charlotte Martinez, testified that Lori had developed a "system" of storing money in baby food jars and envelopes, and that Martinez had seen four baby food jars containing cash and coins in the apartment on February 3. Only two baby food jars, marked "spending money," were found in the apartment after the crimes and both were empty.

Finally, on February 4, the day before the crimes, Lori attempted to pay cash for a new apartment which she and John planned to lease and occupy within a week. The manager of the new place, Vivian Perry, testified that Lori displayed a "roll of bills" that could have represented the security deposit ($315) or the entire move-in amount ($630). Perry refused the cash and Lori arranged to return in two days with a check or money order for $630. Bank records showed a modest withdrawal ($86) but no deposit to the Rainwaters' accounts that day.

[5]The jury did not learn at any phase of trial that defendant was on parole when he moved to California, or that he had been convicted of kidnapping in Utah. However, the jury did hear about Sharon's criminal history at the guilt phase, including the fact that she had been convicted of armed robbery 22 years earlier, that she routinely sold marijuana to support herself, and that she possessed 3 handguns. One of the guns, a stolen .38-caliber Smith and Wesson revolver, was identified as the probable murder weapon in the Rainwater crimes and will be discussed further in the text.

spoke with Lori once and with Lori and John another time. During one of these visits, defendant learned the couple collected rent from the tenants. Defendant ultimately rented an apartment elsewhere.

Several witnesses testified that they saw defendant with Sharon's .38-caliber Smith and Wesson revolver a few hours before the crimes on February 4. Between 5:30 and 6 p.m. that day, defendant retrieved the gun from Sharon's sister, Davene, and took it to Sharon's apartment. He admired it in the presence of Sharon and her daughter, Arlene, and then placed it in the storage room of Sharon's carport. Defendant left in his car and did not return to spend the night with Sharon—an atypical occurrence.[6]

According to Sharon and her daughter, defendant was first seen on February 5 between 7 and 7:30 a.m., an hour or so after the Rainwaters were shot. He arrived at Sharon's apartment freshly showered, asking for a ride to work.

Sharon testified that later the same day, defendant bought a substantial amount of cocaine from one Reuben Rangel. Much of the $2,300 or $2,400 purchase price came from money ($1,700) defendant had apparently earned from prior drug sales and placed in Sharon's safe. An additional $400 or $500 came from a white envelope he was carrying in his pants pocket at the time. Sharon explained that defendant used cocaine and also sold it to earn money for a motorcycle. She purchased three pounds of marijuana from Rangel on the same occasion.

The next day, February 6, a local task force executed a narcotics search warrant at Sharon's apartment. The officers seized over three pounds of marijuana and discovered defendant flushing "bindles" of cocaine down the toilet. Defendant, Sharon, and one of Sharon's adult sons were arrested at the scene. Officer Miller of the task force seized all three of Sharon's handguns, including the .38-caliber Smith and Wesson revolver, which was found in the carport storage spot used by defendant two days earlier. Defendant told Sharon shortly after their arrest that the gun could cause "trouble."

Although the .38-caliber revolver was inventoried and placed in an evidence bag during the raid, Officer Miller inadvertently left it behind in Sharon's apartment. The gun was discovered later the same evening by

---

[6]Defendant was accompanied that evening by his friend, Michael Rohde, who was much thinner and shorter than defendant. The prosecutor theorized in argument to the jury that Michael was defendant's partner in the Rainwater crimes. Michael was apparently incarcerated for an unrelated offense at the time of defendant's trial, and was not charged or called as a witness herein.

Sharon's sister, Davene, and by Michael Rohde and his wife. Testimony by Davene and Mrs. Rohde indicated that Michael became "excited" when he saw the gun. He promptly took it home, buried it, and burned the evidence bag. Michael told defendant over the phone the same night that the police "only got two [of Sharon's guns]. Everything's okay. Do you understand?"

Sharon was soon released on bail in the drug case, but defendant (a parolee) remained in custody for four months until his arrest in this case. Sharon testified that during the three months between the time of her release and the time she first contacted police about the Rainwater case, defendant made various statements indicating that he and possibly Michael were involved in the killings.

The first few statements concerned the .38-caliber revolver. In the week following Sharon's release, defendant repeatedly demanded over the phone that she retrieve the gun from Michael and "break it down and get rid of it." Frightened by his tone, Sharon complied. She and her sister removed the handgrips and some screws and springs, but were otherwise unable to dismantle the gun. Sharon then drove alone to a coastal location known as Ragged Point and threw the gun over the cliff. She discarded the smaller pieces at various places along the highway.

Defendant also inculpated himself in the Rainwater crimes when Sharon visited him in jail one day. Defendant, who was already "visibly upset," confirmed through Sharon that the police had released a composite drawing of the killer. After first looking furtively in the direction of jail guards, defendant stroked the spot on his shaven chin where a goatee had been at the time of the murders. He also pulled the imaginary trigger of a gun and simultaneously said "boom" three times (the total number of gunshots sustained by the victims). After defendant made additional statements of a guilty nature,[7] Sharon expressed concern that both she and defendant had left fingerprints in the Rainwaters' apartment when they inquired about the vacancy. Defendant replied, "Trust me. Just trust me. We wiped it down real good." Sharon did not visit defendant in jail after this exchange.

In a subsequent phone conversation, defendant told Sharon that he had considered killing her but felt sympathy for her family. When she asked if "it" (presumably the capital crime) was motivated by sex or money, defendant said, "I'm no animal. It was money."

---

[7]According to Sharon, defendant said that if he "ever got caught" he would "never see the streets again." He also cautioned Sharon against giving any information about his clothes to police. Defendant further noted that if Sharon's sister, Davene, ever learned "what he did," she would "hate" him. The last statement apparently referred to a fact learned by both Sharon and defendant shortly after the murders, namely, that Davene (who was actually Sharon's half sister) was a distant relative of John Rainwater.

Sharon thereafter learned from defendant that Michael Rohde had been arrested on unspecified charges. She immediately contacted the police about the Rainwater crimes. The lead investigator for the district attorney's office, William Hanley, testified that Sharon provided information which linked defendant to the crimes but which was not known by the general public.

For example, Sharon gave Hanley the bullets that she kept around her house at the time of the crimes.[8] Testimony by several firearm and ammunition experts established that Sharon's bullets were the same type that had been recovered from John Rainwater's body (Remington .38-caliber 95 grain semi-jacketed hollow point), and that only 3 percent of Remington's .38-caliber ammunition fell into this category.

Based on information provided by Sharon, investigators searched Ragged Point and found her partially dismantled Smith and Wesson revolver in a clump of bushes near the water at the base of the cliff. Two expert witnesses found various similarities between the gun and the fatal bullets but, because of rust and corrosion, could not conclusively identify it as the murder weapon.[9]

Investigator Hanley searched defendant's car pursuant to a warrant. A roll of "Shurtape" similar to the duct tape and label found at the crime scene was found underneath the passenger's seat. In addition, a local Kmart receipt was found in a bag in the trunk of defendant's car. It indicated that two $3.97 items (presumably the rolls of duct tape) had been purchased from the home department about one hour before the Rainwaters were last seen alive. (The time on the receipt was either 8:37 or 8:57 p.m.)

The evidence further established that, a few weeks before the crimes, defendant's mother sent defendant a tan Sears jacket from Texas similar to the one found at the crime scene. Sharon and a salesclerk testified that

---

[8]Some of the bullets were stored in a bedroom dresser and others came from a box Sharon discovered wedged behind the spare tire in the trunk of her car. Sharon recognized the box of bullets as hers, but neither she nor any family member had placed it there. Sharon testified, however, that defendant had borrowed her car a few hours before the crimes when he and Michael Rohde retrieved the .38-caliber revolver from Davene.

[9]The weapon was examined and test-fired both before and after "derusting" work was performed on it. The experts involved in the testing process concluded that the murder weapon was probably a Smith and Wesson and that it could have been the one found at Ragged Point. First, the test-fired bullets bore the same general "rifling" characteristics as the bullets recovered from John's body. These characteristics (number, width, and rotation of grooves) are most common among revolvers manufactured by Smith and Wesson. Second, the fatal bullets bore very fine "striations" (scratch marks) typical of Smith and Wesson weapons and atypical of other weapons that could have produced the rifling marks. Third, individual striation marks on the test-fired bullets and one of the fatal bullets corresponded in one or two areas, but not enough correspondence was found to indicate a positive match.

defendant tried to return the jacket at the Sears store in Paso Robles because it was too small for him. The return was not processed, however, because the item could not be found in the California catalog. In addition, Michael Rohde's wife testified that defendant was wearing the same type of jacket when he and Michael left the Rohde home in defendant's car no later than 7:15 p.m. on the evening of the crimes. Mrs. Rohde remembered the jacket because it was "way too small" for defendant.

A fingerprint expert, Martin Collins, testified that based in part on a chemical and laser technique described later in part III.F., *post*, he detected a partial print of defendant's little finger on a crumpled piece of duct tape found at the scene.

At investigator Hanley's request, Sharon agreed to secretly tape-record her phone conversations with defendant in the month before he was charged with the Rainwater crimes. (He was still in custody on noncapital charges.) With Hanley's approval, Sharon occasionally raised topics designed to elicit a response about the capital crimes. Defendant never directly inculpated himself and occasionally said he thought the phones were "bugged." However, in response to Sharon's false statement during the first taped call that police found her fingerprint at the crime scene, defendant said, "I told you there were no prints, what are you talking about?" Sharon also initiated some dialogue about whether anyone saw her throw a "dead cat" into the water and about defendant's retrieval of the "weed" from Davene. Sharon testified that the quoted phrases were disguised references to the .38-caliber revolver. Finally, in the last phone call, the couple discussed the "advertisement"—an apparent reference to a composite drawing the police were due to release of the Rainwater suspect the same day. In response to Sharon's suggestion that her sister was suspicious about defendant's whereabouts the night of the crime, defendant falsely said, "Well, I was with you, Honey."[10]

## B. *Defense Case*

Defendant sought to prove in various ways that someone else committed the crimes.

On cross-examination of investigator Hanley, defendant elicited testimony that a neighbor of the Rainwaters, Tim Lewis, claimed to have seen the killer and was the focal point of the investigation before Sharon became involved. Lewis apparently identified as many as three other men and then disavowed

---

[10]The jury heard the tapes of these conversations, received written transcripts of their contents, and heard Sharon testify about them.

those identifications.[11] Nevertheless, the defense called certain witnesses to suggest that one of the suspects identified by Lewis, Anthony Bradley, might have been involved in the capital crimes. A grocery store clerk who worked across the street testified that she saw two trucks parked near the complex at the time of the shootings and that one of them had chains on the tailgate. (Testimony by Hanley suggested that Anthony Bradley owned a truck with chains, but different in color from either of the trucks seen by the witness.) A defense criminalist also concluded that the foreign pubic hair recovered from Lori was consistent with a sample provided by Anthony Bradley.[12]

In an apparent effort to undermine Sharon's credibility, defendant also offered testimony by drug dealer Reuben Rangel disputing certain details of the drug transaction she had described.[13] In addition, defendant's mother testified that the jacket found at the crime scene was similar to one she bought at Sears and mailed to defendant shortly before the crimes, but it did not have the initials she recalls writing inside.

## II. Penalty Phase Evidence

### A. *Prosecution Case*

1. *Prior felony conviction.*

The prosecution introduced a certified copy of a burglary conviction entered upon defendant's guilty plea in Texas in 1972.

2. *Other violent criminal activity.*

A married couple, the Orrs, testified that on July 3, 1981, they owned a store and gas station in rural Utah and lived in a trailer nearby. While walking with the day's receipts towards the trailer one night, Mr. Orr heard a shot and was accosted by defendant. Defendant threatened to kill and rob Mr. Orr and said he had been "watching" the couple for a week. Defendant accurately recounted some of the couple's recent activities and called to Mrs.

---

[11]Lewis was not called as a defense witness at trial. Hanley testified that investigators found him "extremely" unreliable because, among other things, his identifications were equivocal and his descriptions of the killer were inconsistent.

[12]This opinion contradicted testimony by a prosecution expert, who conclusively excluded Bradley as a possible donor of the foreign pubic hair. According to investigator Hanley, Bradley was a convicted rapist who sometimes visited friends near the Rainwater complex. Bradley was eliminated as a suspect because he had an alibi, no significant physical evidence connected him to the scene, and Lewis ultimately recanted his identification of Bradley.

[13]Rangel testified that the transaction occurred before (not after) the Rainwater crimes, and that defendant had as much as $4,400 in his possession (not $2,300 or $2,400 as estimated by Sharon).

Orr by name in the trailer. Once all three people were inside, defendant continued his profane threats and held Mrs. Orr at gunpoint while ordering Mr. Orr to place the money in a bag. Defendant then forced Mrs. Orr into the couple's car and, in the process, shot Mr. Orr in the back of the neck and took the money. Defendant stopped the car a short distance away and forced Mrs. Orr into another vehicle. Meanwhile, Mr. Orr managed to call police. Defendant and Mrs. Orr were soon stopped by a police roadblock. Mr. Orr testified that he recognized defendant's weapon as a .38-caliber Smith and Wesson revolver.

## B. *Defense Case*

### 1. *Character and background.*

A total of 14 witnesses testified on defendant's behalf at the penalty phase. They included several members of defendant's family, his ex-wife and her family, a police officer, a former employer, and prison officials. In addition, a social anthropologist, Dr. Isabel Wright, researched defendant's hometown and family history and described possible social and cultural influences on his life. Together, these witnesses painted the following picture:

Defendant was conceived out of wedlock when his parents were in their late teens. His father graduated from high school but his mother did not. Defendant was born in November 1951 (making him 35 at the time of the capital crimes). Four more children were born in fairly quick succession.

For the most part, the family lived in and around Mesquite, Texas. Dr. Wright testified that the town operated under a strict moral code and was not racially diverse or tolerant. Corporal punishment was apparently common in the schools. The area experienced a population explosion between 1950 and 1970. According to Dr. Wright, the school and public safety systems were "inadequate," and drug abuse was prevalent in the large teenage population.

During much of defendant's childhood, his father earned a good living selling real estate. According to defendant's mother, the family changed houses, neighborhoods and school districts often, but typically lived in a "nice home" until defendant's parents separated when he was about 18.

By all accounts, the family's home life was unstable. Defendant's father was described by several witnesses, including himself, as a "workaholic" and a heavy drinker. On the rare occasions he was home, he and his wife argued. These arguments often became violent and sometimes resulted in

police intervention and serious physical injury to defendant's mother. She often relied on defendant to defend her physically in these fights. The father was not affectionate towards his children and his disciplinary style was harsh.

Defendant's mother apparently did not stress the value of education, and only one of her children (not defendant) graduated from high school. Dr. Wright believed defendant's mother had trouble displaying love towards her children because she had grown up in an acrimonious and alcoholic home and because she had married too young. Her disciplinary style was described as "inconsistent"—sometimes too severe and sometimes too lax.

Defendant began having academic problems in the sixth grade. He was often truant in junior high and high school, and he eventually left school in the 10th grade. As a teenager, he started using drugs and was apparently detained or arrested by police for several minor offenses.

A police officer who knew defendant during his teens testified that he was basically smart and likeable, but that he became hostile on drugs and alcohol. Both the officer and defendant's uncle suggested that defendant's life might have been different had he been given positive "direction" during this period.

After his parents' divorce, defendant worked odd jobs to help support his mother and younger siblings. Defendant's father continued to harass defendant's mother and caused her to lose several jobs. Defendant introduced his mother to a workmate, Homer, who developed a close relationship with the family. Defendant's mother apparently bore a child by Homer. The family, including defendant, grieved when Homer soon died.

At age 18 or 19, defendant married a local girl. They committed a burglary together, and defendant was convicted and placed on probation. His probation was later revoked, apparently because he was involved in a drunk-driving accident. As a result, defendant served about 20 months in the state prison at Huntsville, Texas. Family members who visited him there noticed that he had become withdrawn and sullen. He also experienced skin problems which were treated only after his father repeatedly complained to prison officials.

At age 24, after he was released from prison and divorced from his first wife, defendant remarried. His second wife, Sandra, two of her four children, and the children's grandmother described defendant as a responsible and caring husband and stepfather. The family moved often during the six-year marriage and defendant held several jobs, including ranch hand, truck driver,

salesman, and coal miner. (Defendant survived a cave-in at the mine.) A truck company owner who employed defendant for a year said he was one of the company's "best" employees. However, while working away from home in July 1981, defendant called Sandra and said he had been arrested in Utah. The couple eventually divorced.

Defendant initially engaged in disruptive behavior toward inmates and staff while imprisoned in Utah. A counselor blamed this period of adjustment on defendant's harsh experiences in the Texas prison system, where the inmates apparently performed hard labor. The Utah counselor testified, however, that defendant's behavior quickly improved. He avoided conflict with other inmates, seemed remorseful about his crimes, and "pioneered" a prison art class. He apparently prevented one inmate from being stabbed and sought medical aid for another stabbing victim. Defendant also performed well in the prison's minimum security fire-fighting unit, where he narrowly escaped injury in a forest fire and helped save an official's life.

2. *Defendant's testimony.*

Over defense counsel's objection and following a competency hearing and determination, defendant testified in narrative form at the penalty phase. He told the jury in clear and sometimes graphic terms that he did not want life imprisonment and believed death was the only "appropriate" penalty. Defendant explained that he had defied his parents' teaching and societal mores and chosen a life of crime beginning at age 16. He described four different murders for which he was never "busted"—a contract murder, a homosexual murder, a race murder, and a burglary murder. Defendant pointed to the tattoos on his arms which symbolized these events. Defendant also indirectly admitted the capital crimes, saying "[t]hose two kids, you know, all they was trying to do was raise a family . . . . They made [the] mistake of crossing the path of me."

Defendant also said he had "manipulated" the prison system by establishing an art class as a means of smuggling drugs into prison and by tricking officials into believing he was trying to save the lives of inmates he had actually stabbed. Finally, defendant made clear that his testimony was not based on a guilty conscience, but on the realization that he was heartless and would not change: "Some people are salvageable, you know. I'm not. [¶] What do you do with a man that does [not] have any feeling? What do you do with a man that doesn't care? What do you do with a rabid dog? Put it to sleep."

### III. Pretrial and Guilt Phase Issues

#### A. *Venue*

■ Defendant contends the trial court erred in denying his motion to change venue from San Luis Obispo County. The motion was initially made and denied without prejudice before jury selection began. Contrary to what the parties state or imply in their appellate briefs, the motion was renewed near the close of voir dire and denied a second time.

■ In determining whether a change of venue is warranted, the trial court typically considers the nature and gravity of the offense, the size of the community, the status of the defendant, the prominence of the victim, and the nature and extent of the publicity. On appeal, the defendant must show that the court "erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it was reasonably likely that a fair trial was not in fact had." (*People* v. *Edwards* (1991) 54 Cal.3d 787, 807 [1 Cal.Rptr.2d 696, 819 P.2d 436].) We sustain any factual determinations supported by substantial evidence, and independently review the court's determination as to the reasonable likelihood of a fair trial. (*Ibid.*)

■ The charged offenses involved a tragic double slaying and were very serious. However, as the trial court recognized, all remaining factors were neutral or weighed against a change of venue.

The record indicates that a few months before jury selection began, San Luis Obispo was a moderately sized county with a total population of almost 200,000. By contrast, motions to change venue have been granted where the county is relatively isolated and small. (See, e.g., *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 582 [174 Cal.Rptr. 701, 629 P.2d 502] [Placer County, population 106,500]; *People* v. *Tidwell* (1970) 3 Cal.3d 62, 64 [89 Cal.Rptr. 44, 473 P.2d 748] [Lassen County, population 17,500].)

The record also does not support defendant's claim that the media characterized him as a "pariah." His status as a recent parolee from another state was mentioned, but some articles also observed that he lived and worked in the local community.

Contrary to what defendant argues, any "posthumous prominence" achieved by the victims through news accounts of their deaths did not favor a change of venue. Defendant concedes the Rainwaters led quiet, relatively obscure lives. As a result, the community was not likely to have experienced

a uniquely heightened sense of loss or anger which would presumably be alleviated by trial in another county. Any sympathetic features of the case would be apparent wherever it was tried.

Defendant characterizes the extent of news coverage as "unclear" but presumably vast, and he points to numerous requests by the media to cover courtroom proceedings before and during trial. However, the record discloses only a modest number of printed news stories—19 by our count—most of which circulated almost a year before jury selection and trial. Defendant also places great emphasis on a phone survey he conducted shortly before the first venue ruling suggesting that a high percentage of county residents recalled the basic facts of the crimes and that many knew about the community's efforts to help the victims' children. However, relatively few survey participants indicated that they were aware of information connecting defendant to the crimes, that they believed he was guilty, or that they would have been unable to act impartially as jurors.

With one or two exceptions, the articles described the crimes and defendant's alleged involvement in nonsensational terms. Many accounts simply reported the procedural progress of the case through the court system. Some also focused on the lack of any eyewitness identification of defendant.

Finally, there is no reasonable likelihood defendant did not receive a fair trial. He does not dispute that most of the actual jurors and alternates indicated during jury selection that they knew little or nothing about the crimes. Defendant specifically complains in his reply brief about the potential effect of pretrial publicity on only one juror, Ms. Hall. However, jurors "need not be totally ignorant of the facts and issues," and we have no reason to doubt statements made by Juror Hall during voir dire indicating that she could be fair and impartial. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 807 [281 Cal.Rptr. 90, 809 P.2d 865].)[14]

We conclude defendant has not established error or prejudice in the denial of his venue motions.

B. *Sharon's Psychiatric Records*

Shortly after the complaint was filed in the municipal court in this case, defendant subpoenaed a private psychiatrist and a county mental health

---

[14]Defendant observes that Juror Hall suggested during voir dire that early news accounts about the crime made defendant look "guilty." She explained, however, that she did not follow these accounts "closely," that she still had an "open mind" as to guilt, and that she could follow instructions requiring jurors to consider the evidence and to avoid all publicity. We find it "significant" that defendant did not challenge Juror Hall for cause, and that defendant exercised only 16 of his 26 peremptory challenges. (*People* v. *Cooper*, *supra*, 53 Cal.3d 771, 807.)

center for records relating to psychotherapy administered to Sharon White Bear before she contacted the police and became a prosecution witness in this case. The subpoenaed parties transmitted the records to the court under seal and claimed they were protected under the psychotherapist-patient privilege. (See Evid. Code, § 1010 et seq.) With the exception of "sanitized" excerpts discussed below, the contents of the records have apparently never been seen by defendant, his counsel, or the People.

Defendant sought disclosure of Sharon's records on three separate occasions below: in the municipal court before the preliminary hearing, in the superior court before trial, and in postjudgment proceedings to correct and settle the record in superior court. (The last two motions were made before Judge Conklin, who presided at trial in this case.) Fairly summarized, the same basic arguments, procedures, and rulings were involved at every stage as follows:

Defendant argued that assuming the psychiatric records showed Sharon suffered from "delusions" or other mental disorders affecting her competence or credibility as a witness, defendant's right to "fairly cross-examine" her under the due process and confrontation clauses of the federal Constitution would prevail over any state law privilege or privacy interest Sharon might otherwise claim in the records. The prosecutor seemed to agree that disclosure could be compelled to the extent the records contained the type of information identified by the defense.

Following in camera reviews urged by both parties, the magistrate, and later the superior court, found little "relevant" information in the psychiatric records and concluded they were privileged in most respects. At both levels, trial counsel was informed that the records showed chronic drug and alcohol abuse and a history of depression and anxiety for which tranquilizers had been prescribed. However, in words uttered by the magistrate and reiterated by Judge Conklin, there was absolutely no indication that Sharon suffered from or was diagnosed with any "thought difficulties, . . . delusions, hallucinations," or other "mental illness that would in any way affect her ability to perceive, recollect or relate events that she had witnessed." The magistrate further disclosed that the records showed Sharon had told her therapist about defendant's arrest in the capital case. The prosecutor conceded the latter information was discoverable. In an apparent abundance of caution, the magistrate also furnished counsel on both sides with confidential "sanitized" copies of records arising out of Sharon's therapy sessions from the time of the capital crimes forward.

We note that all psychiatric materials are included as sealed exhibits in the record on appeal. Appellate counsel and the Attorney General have received access to the same "sanitized" excerpts made available to trial counsel.[15]

 ▬ ██ We further note that on cross- and redirect examination at trial, Sharon disclosed that she had been undergoing psychiatric treatment for anxiety and substance abuse for several years, up to and including the time of trial, and that tranquilizing medication had been prescribed throughout that time.[16]

 Defendant argues here, as below, that limited pretrial disclosure of the psychiatric records prejudicially undermined his right to cross-examine Sharon effectively at trial. Defendant relies primarily on *Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39 [94 L.Ed.2d 40, 107 S.Ct. 989] (*Ritchie*), which discusses a criminal defendant's federal constitutional rights in this context.[17]

 Simply stated, it is not clear whether or to what extent the confrontation or compulsory process clauses of the Sixth Amendment grant pretrial

---

[15]As suggested earlier, appellate counsel sought disclosure of the psychiatric materials from Judge Conklin during postjudgment record settlement proceedings. Judge Conklin reviewed the records in camera and—as both he and the magistrate had done before—found that their wholesale disclosure was prohibited under the psychotherapist-patient privilege. Judge Conklin also denied appellate counsel access to the "sanitized" excerpts that the magistrate had made available to trial counsel. Before appellate briefs were filed, appellate counsel asked this court for permission to examine all psychiatric records, whether "sanitized" or not. We reviewed the records in their entirety and granted appellate counsel and the Attorney General permission to examine the "sanitized" excerpts only. Thus, in deciding the privilege question on direct appeal, this court is actually reviewing the sealed psychiatric materials for the second time.

[16]In his reply brief, defendant claims that Sharon waived the privilege as to her entire psychiatric file by providing information about her treatment and medication at trial. We disagree. Because defendant never raised this issue in the trial court and never formally renewed his disclosure motion in light of Sharon's testimony, the contention has not been preserved on appeal. In any event, Sharon's brief testimony about treatment and medication did not extend beyond information found relevant to her credibility and disclosed to the parties following in camera review below. Hence, no broad waiver of the privilege as it applies to any other topics contained in her records can be inferred. (Cf. *People* v. *Mickle* (1991) 54 Cal.3d 140, 189-190 [284 Cal.Rptr. 511, 814 P.2d 290] [prosecution successfully renewed request for access to defendant's psychiatric records after defendant tendered complete psychiatric history on the stand].)

[17]The Attorney General seems to argue that defendant has waived the *Ritchie* claim because he failed to challenge the magistrate's ruling on this ground in the superior court. We disagree. While defendant articulated his position most precisely before the magistrate, it was clear in the superior court that the same federal constitutional claim was being presented as a basis for discovering the psychiatric records before trial. We note that defendant also has raised the *Ritchie* claim in all posttrial discussions of the psychiatric records, i.e., during record settlement proceedings in the superior court, in his motion to examine the sealed records in this court, and in his briefs on appeal.

discovery rights to the accused. (See *Ritchie, supra,* 480 U.S. 39, 51-54 [94 L.Ed.2d 40, 53-55] (plur. opn. of Powell, J.), 55-56 [94 L.Ed.2d 56-57] (maj. opn. of Powell, J.); *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 805-806, fn. 18 [268 Cal.Rptr. 753, 789 P.2d 934].) However, the due process clause requires the "government" to give the accused all "material" exculpatory evidence "in its possession," even where the evidence is otherwise subject to a state privacy privilege, at least where no clear state policy of "absolute" confidentiality exists. (*Ritchie, supra,* 480 U.S. at pp. 56-58 [94 L.Ed.2d at pp. 56-58].) When the state seeks to protect such privileged items from disclosure, the court must examine them in camera to determine whether they are "material" to guilt or innocence. (*Id.,* at pp. 57-61 [94 L.Ed.2d at pp. 57-60].) In *Ritchie, supra,* the high court held that a complete in camera review of confidential records generated by a state agency as part of a molestation investigation was required where the defendant claimed they might undercut the complaining witness's credibility and where state law did not bar their disclosure under all circumstances. (*Id.,* at p. 61 [94 L.Ed.2d at p. 60].)

 At the outset, we question whether records stemming from Sharon's voluntary treatment by private and county therapists can be deemed "in the possession" of the "government" in the manner assumed by *Ritchie.* The records were not generated or obtained by the People in the course of a criminal investigation, and the People have had no greater access to them than defendant. Given the strong policy of protecting a patient's treatment history, it seems likely that defendant has no constitutional right to examine the records even if they are "material" to the case.

However, even assuming *Ritchie* applies, no error occurred. On three different occasions, the lower courts examined the records in camera and concluded that, with minor exceptions, they contained no information significant enough to override Sharon's privilege of confidential psychotherapy. Any information having any arguable bearing on defendant, the capital crimes, and Sharon's ability to testify truthfully and accurately was disclosed. Our own careful review of the records supports all prior judicial characterizations of their contents. We therefore find no error in the restrictions placed on defendant's discovery of Sharon's psychiatric records.

C. *The Revolver*

 Defendant claims the trial court erred in denying his pretrial motion to dismiss the case or, alternatively, to suppress the .38-caliber revolver on the ground that the police failed to adequately preserve it from destruction within the meaning of *California v. Trombetta* (1984) 467 U.S. 479 [81

L.Ed.2d 413, 104 S.Ct. 2528]. Evidence before and during trial indicated that the police found and seized the revolver while executing an unrelated narcotics search warrant at Sharon's apartment the day after the Rainwater murders, but that they accidentally left the weapon behind when they departed. Sharon later tried to dismantle and dispose of the gun at Ragged Point because defendant told her to "get rid of it."

Defendant argues here, as below, that if the police had not failed to confiscate the gun it would not have undergone deterioration at Ragged Point and it might have been conclusively eliminated as the murder weapon. We find no error.

■ The relevant principles have been discussed many times before. (See, e.g., *People* v. *Zapien* (1993) 4 Cal.4th 929, 964-965 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 165-166 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Cooper, supra*, 53 Cal.3d 771, 810-811.) "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. [Fn.] To meet this standard of constitutional materiality [citation], evidence must both possess an *exculpatory value that was apparent before the evidence was destroyed*, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California* v. *Trombetta, supra*, 467 U.S. 479, 488-489 [81 L.Ed.2d 413, 421-422], italics added.) More recently, the high court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Arizona* v. *Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 281, 289, 109 S.Ct. 333].)[18]

■ We doubt the foregoing cases create an official duty to protect evidence from a suspect's own deliberate attempts to destroy it. The due process principles invoked by defendant are primarily intended to deter the police from purposefully denying an accused the benefit of evidence that is in their possession and known to be exculpatory. (*Arizona* v. *Youngblood*,

[18]The Attorney General argues that any official duty to "preserve" evidence did not arise here because police officers never physically removed the revolver from Sharon's apartment and it was not in their possession at the time the complained of deterioration occurred. (See *People* v. *Daniels* (1991) 52 Cal.3d 815, 855 [277 Cal.Rptr. 122, 802 P.2d 906] ["the police duty to obtain exculpatory evidence is not as strong as its duty to preserve evidence already obtained"].) However, Officer Miller testified that he seized, inventoried, and bagged the revolver during the narcotics search and that, but for an admitted oversight, he would have taken it into police custody with other guns and evidence seized at the same time. Hence, it appears the revolver had been "obtained" by the police.

*supra*, 488 U.S. 51, 58 [102 L.Ed.2d 281, 289-290].) Here, however, police conduct in leaving the revolver in Sharon's apartment can "at worst be described as negligent." (*Ibid.*) It was defendant who—evidently concerned about the gun's inculpatory value—frightened Sharon into disposing of it at Ragged Point. Common sense suggests that defendant, not the police, should be held accountable for any ensuing damage that made it impossible to conclusively identify or eliminate the gun as the murder weapon.

No constitutional violation occurred for another obvious reason—the revolver has never had any discernible exculpatory value. Officer Miller testified that he attempted to confiscate the gun along with two other weapons because he believed that Sharon and defendant, as ex-felons, were prohibited from possessing firearms. Thus, in any narcotics prosecution or parole revocation hearing arising out of the search of Sharon's apartment, the revolver might have been relevant only insofar as it formed the basis of additional criminal charges against defendant.

As noted by the trial court, the revolver also had no known connection to the capital crimes at the time the narcotics task force purportedly mishandled it. Testimony by Officer Miller and investigator Hanley indicated that officials were not aware of defendant's possible involvement in the murders until Sharon contacted Hanley three months after the task force searched her apartment. All evidence that has since surfaced about Sharon's revolver strongly suggests that it was the murder weapon. Nothing in the record indicates that ballistics tests performed under different conditions would have reached a contrary conclusion.

We also reject defendant's claim that the trial court erred in denying his separate pretrial motion to exclude the revolver as irrelevant and unduly prejudicial. (Evid. Code, §§ 210, 352.) The motion was premised on the fact that the gun was never conclusively identified as the murder weapon.

However, ample evidence established that the Rainwaters were killed with special .38-caliber bullets, that defendant had access to the same bullets and to Sharon's .38-caliber revolver shortly before the murders, and that he attempted through Sharon to destroy the gun afterwards. Recovery of the deteriorated gun from a remote location specified by Sharon corroborated her testimony that she disposed of the weapon at defendant's direction. The gun, expert ballistics testimony, and Sharon's account tended to confirm the inference that the gun found at Ragged Point was used to kill the Rainwaters and that defendant was involved in the crimes. We conclude the trial court did not abuse its discretion in determining that the probative value of the gun substantially outweighed any prejudicial impact.

D. *The Search of Defendant's Car*

■ Defendant renews his pretrial claim that certain items connecting him to the crime scene—the Kmart receipt and a roll of duct tape—should have been suppressed because the affidavit submitted in support of the warrant did not establish probable cause to search his car.

Contrary to defendant's suggestion, the magistrate could properly conclude, under the "totality of the circumstances," that there was probable cause to believe contraband or evidence would be found in the car. (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 548, 103 S.Ct. 2317].) The warrant issued about two weeks after Sharon first contacted investigator Hanley about the Rainwater crimes. Hanley's affidavit and a report he had prepared and attached thereto described, at length, the circumstances surrounding the murders, Sharon's identity and relationship to defendant, and the information she had provided concerning defendant's possible involvement in the crimes. The warrant materials also suggested that defendant had used the car the night and morning of the crimes, and they identified the evidence likely to be found therein, including duct tape. The affidavit also described other evidence that corroborated Sharon's account, including the jacket found at the crime scene, the .38-caliber revolver found at Ragged Point, the results of ballistics tests on the revolver and the fatal bullets, and the similarity between the fatal bullets and Sharon's bullets. The affidavit materials noted that defendant had been in custody on drug charges during the three and a half months since the murders had occurred, thus suggesting he had not removed any evidence from the car in the interim.

Defendant primarily criticizes the affidavit for failing to adequately disclose Sharon's "true character," including her prior felony conviction, her psychiatric treatment history, her alleged perjury at defendant's parole revocation hearing, the drug charges pending against her as a result of the search of her apartment, and her attempted destruction of the probable murder weapon. Defendant insists that these omissions were deliberate and material, and that the magistrate was misled to believe Sharon was an "innocent" citizen whose hearsay statements to investigator Hanley were presumptively reliable. (See *Franks v. Delaware* (1978) 438 U.S. 154, 171-172 [57 L.Ed.2d 667, 681-682, 98 S.Ct. 2674].)

We disagree. The affidavit materials stated that Sharon earned money "dealing marijuana out of her apartment." The magistrate could reasonably infer that criminal charges were pending against Sharon based on additional statements that she and defendant were recently "arrested" by the narcotics task force and that she "bailed out" of jail on drug charges. The affidavit

materials also described Sharon as an "ex-convict" in the possession of three handguns at the time of her arrest, including a stolen .38-caliber revolver. The materials identified the revolver as the probable murder weapon and described Sharon's attempts to keep the police from tracing it to defendant.

In short, we deem it unrealistic to require that a warrant affidavit include an informant's detailed drug and psychiatric history, or every past act that can be considered unlawful or dishonest. As the trial court concluded in denying defendant's suppression motion, no material omissions concerning matters bearing on Sharon's reliability as an informant are apparent. The court did not err in denying defendant's motion to suppress evidence seized from his car.[19]

## E. Disqualification Motion

Judge Conklin ruled on various pretrial motions discussed above (venue, discovery of Sharon's psychiatric records, admissibility of the .38-caliber revolver, and suppression of evidence seized from defendant's car). The case was subsequently assigned to another judge for trial, but he was recused. The matter was retransferred and assigned to Judge Conklin for trial. Defendant immediately filed a peremptory challenge under Code of Civil Procedure section 170.6.[20] The motion was denied as untimely on the ground that Judge Conklin had already resolved contested issues closely related to the merits of the case. (See *In re Abdul Y.* (1982) 130 Cal.App.3d 847, 857-861 [182 Cal.Rptr. 146].) Defendant's petition for writ relief in the Court of Appeal was summarily denied.

We agree with the Attorney General that defendant's peremptory challenge is not reviewable on appeal. We recently held that litigants challenging denial of a judicial disqualification motion must seek mandate as provided in Code of Civil Procedure section 170.3, subdivision (d),[21] and that this expedited procedure is the exclusive means for reviewing an unsuccessful peremptory challenge filed under section 170.6 of the same

[19]In light of the foregoing analysis, we need not address the Attorney General's alternative claim that the search of defendant's car was valid because investigator Hanley obtained the prior consent of defendant's parole officer. Testimony in support of this theory was introduced at the hearing on defendant's motion to quash the warrant in the superior court.

[20]Code of Civil Procedure section 170.6, subdivision (1) states in part: "No judge, court commissioner, or referee of any superior, municipal or justice court of the State of California shall try any civil or criminal action or special proceeding of any kind or character nor hear any matter therein which involves a contested issue of law or fact when it shall be established as hereinafter provided that the judge or court commissioner is prejudiced against any party or attorney or the interest of any party or attorney appearing in the action or proceeding."

[21]Code of Civil Procedure section 170.3, subdivision (d) provides: "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed

code. (*People* v. *Hull* (1991) 1 Cal.4th 266, 268 [2 Cal.Rptr.2d 526, 820 P.2d 1036] [*Hull*].) *Hull* relied on the pertinent statutory language and on the Legislature's obvious intent to promote judicial economy through speedy pretrial resolution of disqualification motions. (1 Cal.4th 266, 271-275.)

Defendant insists that *Hull*, *supra*, 1 Cal.4th 266, cannot fairly be applied to him because it was decided after his trial. However, judicial decisions are generally retroactive absent constitutional or equitable reasons compelling a contrary result. (See *People* v. *Welch* (1993) 5 Cal.4th 228, 237-238 [19 Cal.Rptr.2d 520, 851 P.2d 802]; *People* v. *King* (1993) 5 Cal.4th 59, 79-80 [19 Cal.Rptr.2d 233, 851 P.2d 27].) No such reason exists here. Defendant sought pretrial review—albeit unsuccessfully—of the denial of his peremptory challenge as provided in Code of Civil Procedure section 170.3, subdivision (d). As in *Hull*, we conclude defendant cannot relitigate the issue in the instant appeal.

## F. *Fingerprint Evidence*

 Defendant contends the trial court erred in denying his motion to exclude evidence that his fingerprint was found on a piece of duct tape at the crime scene. Defendant contends here, as below, that the evidence was based in part on a chemical and laser process not generally accepted as reliable in the scientific community. (*People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240] [*Kelly*]; see also, *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145].) For reasons we will explain, no error occurred.

The relevant testimony was provided by prosecution witness Martin Collins, a "latent print analyst" employed for many years by the state Department of Justice and engaged by the police to examine evidence in the Rainwater case, including the duct tape. At trial, Collins explained in detail how he placed the tape in an enclosed tank, exposed it to heat, superglue, and dye, and then viewed and photographed the item through an orange filter with the aid of a laser beam. This process produced a photographic image of a fingerprint that Collins then compared to a sample print provided by defendant. Collins found a "positive" match using settled law enforcement standards calling for "eight points of similarity." (The two prints had thirteen points of similarity and no dissimilarities.) Slides and photographs of each stage of the chemical and laser process were introduced. Using comparative photographs of the print found on the duct tape, and of defendant's print, Collins also showed the jury the individual similarities he had found.

only by a writ of mandate from the appropriate court of appeal sought within 10 days of notice to the parties of the decision and only by the parties to the proceeding."

During Collins's testimony, defendant objected on the ground that no evidence had been introduced suggesting the laser procedure was a "scientifically acceptable" means of deriving an accurate and readable fingerprint. On voir dire, Collins explained how the procedure "luminated" latent prints, and he indicated that the image of the fingerprint found on the duct tape had not been altered by mechanical or human means. Defendant introduced no competing expert testimony. The trial court ultimately denied defendant's motion to exclude Collins's testimony.

■ Defendant correctly observes that California courts have long been willing to forego admission of "new" scientific methods used to detect, analyze, or produce evidence absent a credible threshold showing that "the pertinent scientific community no longer views them as experimental or of dubious validity." (*People* v. *Stoll* (1989) 49 Cal.3d 1136, 1156 [265 Cal.Rptr. 111, 783 P.2d 698], citing *Kelly, supra*, 17 Cal.3d 24, 31.) This approach is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not. (*People* v. *Stoll, supra*, 49 Cal.3d at p. 1156.)

■ We agree with the Attorney General that such concerns are not implicated here. The reliability of the laser procedure in producing an image commonly recognizable only as a human fingerprint was manifest at trial. The photographic result of Collins's method was seen by the jury, and there was no dispute that the method produced this result without tampering or alteration of any kind. Since the laser process produced a directly recognizable image of defendant's fingerprint, it is unreasonable for defendant to suggest that the process might somehow have captured a fingerprint which did not exist, transformed some other image into a fingerprint, or changed the fingerprint of another person into one which matched defendant's.

Where, as here, a procedure isolates physical evidence whose existence, appearance, nature, and meaning are obvious to the senses of a layperson, the reliability of the process in producing that result is equally apparent and need not be debated under the standards of *Kelly, supra*, 17 Cal.3d 24. We therefore conclude that the laser-derived fingerprint image could not properly have been excluded on grounds it was derived by scientifically unproven means.[22]

G. *Tape-recorded Telephone Conversations*

As noted, defendant and Sharon were arrested the day after the Rainwater murders on unrelated narcotics charges. Sharon was soon released but

---

[22]Since we have concluded that *Kelly* does not apply, we need not address the Attorney General's alternative request that *Kelly* be reexamined in light of the high court's recent decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S.__ [125 L.Ed.2d 469, 113 S.Ct. 2786].

defendant remained in custody on a "parole hold" for four months until his arrest in the instant case. About one month before defendant's arrest herein, Sharon contacted investigator Hanley about defendant's possible involvement in the Rainwater crimes. Sharon agreed to tape-record her telephone conversations with defendant and to elicit information about the crimes. Counsel had apparently been appointed to represent defendant in the drug and/or parole violation case before Sharon recorded any telephone calls.

On several occasions during the ensuing month, defendant used the jail telephone to call Sharon at home. She recorded these calls, most of which concerned personal matters such as the couple's mutual devotion. However, Sharon occasionally prompted defendant to discuss the Rainwater case by talking in "code" on certain subjects (e.g., the murder weapon and composite drawing), and by fabricating stories about evidence which purportedly linked defendant to the capital crimes. As previously disclosed, defendant made several statements which tended to incriminate him in the crimes. The contents of the tape-recorded conversations were fully disclosed at trial, and Sharon interpreted the couple's "code" words for the jury.[23]

On appeal, defendant contends the trial court erred in denying his pretrial motion to exclude evidence of his telephone conversations with Sharon during the time she worked as a police informant in this case. Defendant claims that admission of this evidence violated his privilege against self-incrimination and his right to counsel under the Fifth and Sixth Amendments to the United States Constitution, and under parallel provisions of the California Constitution. We conclude that even assuming Sharon was a "police agent" subject to these provisions, the trial court correctly determined that they did not bar admission of the taped conversations and related testimony.

1. *Privilege against self-incrimination.*

Defendant argues that Sharon's efforts to elicit incriminating statements about the capital crimes while he was incarcerated on unrelated charges violated *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] (*Miranda*). *Miranda* requires that a suspect be given certain advisements to preserve the privilege against self-incrimination, or to

---

[23]In his written pretrial suppression motions, defendant targeted the contents of the taped conversations and any other evidence obtained as the "fruit" thereof. The latter category logically includes Sharon's testimony interpreting "code" phrases used in the conversations. Although defendant did not reiterate the constitutional basis of his objection at trial, he specifically asked the court to exclude Sharon's "code" testimony. Thus, contrary to a suggestion by the Attorney General, defendant has adequately preserved the right to challenge this portion of Sharon's testimony on appeal.

ensure its voluntary and intelligent waiver, during the inherently coercive circumstances of a "custodial interrogation." (*Id.*, at p. 444 [16 L.Ed.2d at p. 706].) Defendant insists that his statements to Sharon were inadmissible at trial because he did not receive or waive his *Miranda* rights beforehand.

 The high court recently rejected a similar claim involving a government agent posing as the defendant's cellmate. "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated' atmosphere and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. . . . When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking. . . . [¶] . . . We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." (*Illinois* v. *Perkins* (1990) 496 U.S. 292, 296-297 [110 L.Ed.2d 243, 251, 110 S.Ct. 2394], internal citations omitted.)

 We similarly conclude that statements defendant made to Sharon over the jail telephone were not the product of "custodial interrogation." Defendant sensed that the telephones available to inmates were "bugged," but he did not know Sharon was cooperating with law enforcement and recording their conversations. From defendant's perspective, he was talking with a friend and lover. "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner" or ally. (*Illinois* v. *Perkins*, *supra*, 496 U.S. at p. 297 [110 L.Ed.2d at p. 251].) Under the circumstances, defendant's tape-recorded statements were completely voluntary and compulsion-free. The trial court correctly denied defendant's motion to exclude this evidence under the Fifth Amendment.

2. *Right to counsel.*

Defendant next relies on the rule prohibiting the government from using an undercover agent to "deliberately elicit[ ]" incriminating statements from an accused in circumvention of his Sixth Amendment right to counsel. (*Massiah* v. *United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246, 250, 84 S.Ct. 1199] [*Massiah*].) The right attaches at the " 'initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " (*United States* v. *Gouveia* (1984) 467 U.S. 180, 188 [81 L.Ed.2d 146, 154, 104 S.Ct. 2292].) Defendant suggests that because counsel had already been

appointed to assist him with narcotics and/or parole revocation charges, statements surreptitiously elicited and recorded by Sharon concerning the Rainwater murders were inadmissible in the capital trial.

 It is settled, however, that the Sixth Amendment right to counsel is "offense-specific," i.e., it attaches only to those offenses for which adversary judicial criminal proceedings have begun. (*McNeil* v. *Wisconsin* (1991) 501 U.S. 171, 175 [115 L.Ed.2d 158, 166-167, 111 S.Ct. 2204]; *People* v. *Clair* (1992) 2 Cal.4th 629, 657 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Here, defendant was not arrested on capital charges until the day after Sharon taped the couple's last phone conversation. Thus, under the foregoing authorities, defendant's Sixth Amendment rights had not yet attached in this case and could not have been violated when Sharon performed her undercover work. No contrary conclusion is compelled by the fact that defendant had already been charged, incarcerated, and appointed counsel on wholly unrelated offenses. (*People* v. *Wader* (1993) 5 Cal.4th 610, 636 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People* v. *Clair, supra,* 2 Cal.4th 629, 657; cf. *In re Wilson* (1992) 3 Cal.4th 945, 949-955 [13 Cal.Rptr.2d 269, 838 P.2d 1222].)

Defendant insists the police had "sufficient evidence" to arrest him on capital charges at a much earlier point in time and that they unreasonably "delayed" doing so in order to give Sharon more time in which to elicit incriminatory statements. Defendant emphasizes testimony by investigator Hanley and Sharon at trial indicating that Hanley told Sharon before the last taped conversation that defendant would be arrested the next day, and that she should intensify her questioning about the Rainwater crimes.

Defendant has waived the *Massiah* claim to the extent it rests on this trial testimony. No similar evidence was introduced at the pretrial suppression hearing, and defendant failed to formally renew his *Massiah* motion in light of the new testimony at trial. (See *People* v. *Morris* (1991) 53 Cal.3d 152, 189-190 [279 Cal.Rptr. 720, 807 P.2d 949].)

In any event, any conscious delay in arresting defendant in this case did not violate defendant's Sixth Amendment right to counsel. In *Hoffa* v. *United States* (1966) 385 U.S. 293 [17 L.Ed.2d 374, 87 S.Ct. 408] (*Hoffa*), defendant's colleague, acting as a paid government informant, acquired information over a two-month period about the defendant's efforts to bribe the jury in an ongoing criminal trial. In a subsequent prosecution on jury tampering charges, the defendant sought to exclude the informant's testimony on the ground that the government improperly delayed arrest in the bribery matter in order to obtain incriminating information in violation of his Sixth Amendment right to counsel under *Massiah, supra,* 377 U.S. 201.

The *Hoffa* court rejected the claim. "There is no constitutional right to be arrested. [Footnote omitted.] The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause . . . ." (*Hoffa* v. *United States, supra,* 385 U.S. 293, 310 [17 L.Ed.2d 374, 386].) A contrary rule would similarly impinge upon prosecutorial discretion to decide whether and when to file criminal charges. (See *United States* v. *Lovasco* (1977) 431 U.S. 783, 790-796 [52 L.Ed.2d 752, 759-763, 97 S.Ct. 2044].)

In light of the foregoing, the trial court did not err in admitting evidence of the telephone conversations recorded by Sharon.[24]

## H. *Robbery and Burglary Issues*

Defendant raises several claims concerning the admissibility and sufficiency of evidence of robbery and burglary. For the most part, the arguments focus on whether property belonging to the victims was taken during the alleged robbery and whether an intent to rob existed at the time of the burglary. We conclude that none of the claims has merit.[25]

---

[24]In making his Fifth and Sixth Amendment claims, defendant relies upón a pre-*Miranda* case, *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] (*Escobedo*). *Escobedo* purported to recognize a prearrest right of counsel where, among other things, an "investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect." (*Id.,* at p. 490 [12 L.Ed.2d at p. 986]; see also *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) Despite contrary language in *Escobedo* itself, later authority makes clear that *Escobedo* rests solely on Fifth Amendment principles. (*Moran* v. *Burbine* (1986) 475 U.S. 412, 429 [89 L.Ed.2d 410, 426, 106 S.Ct. 1135].) In "reaffirm[ing]" and expanding upon *Escobedo,* the *Miranda* court also made clear that both cases were concerned solely with prophylactic measures, including the right to counsel, available to suspects undergoing "custodial interrogation." (*Miranda, supra,* 384 U.S. 436, 442, 444, & fn. 4 [16 L.Ed.2d 694, 705-706].) Hence, *Escobedo* does not support defendant's claim that his Sixth Amendment right to counsel was violated, nor does it give rise to any Fifth Amendment claim not otherwise available under *Miranda.*

[25]Appellate counsel makes these arguments in an effort to invalidate the special circumstance findings of murder in the commission of a robbery and burglary. However, as trial counsel recognized in making similar arguments below, other aspects of the jury's verdict are also theoretically implicated, namely, the robbery and burglary counts, and the first degree murder counts (which were submitted to the jury on both premeditation and felony-murder theories). All claims discussed in this section were timely raised by motions *in limine* or to dismiss the case.

### 1. *Habit evidence.*

 Defendant argues the trial court erred in rejecting his attempt to exclude testimony by Lori's mother, Charlotte Martinez, about Lori's habit of storing money in baby food jars and envelopes. (See Evid. Code, § 1105.)[26] The prosecution introduced this evidence to bolster the inference that money was present in the victims' apartment at the time of the crimes. An inference that defendant took the money was raised, in turn, by evidence that two baby jars marked "spending money" were found empty in the apartment after the crimes, and that defendant was carrying a cash-filled envelope after the murders.

We see no error. "The question whether habit evidence is admissible is essentially one of threshold relevancy [and] is addressed to the sound discretion of the trial court. [Citations.]" (*People* v. *McPeters* (1992) 2 Cal.4th 1148, 1178 [9 Cal.Rptr.2d 834, 832 P.2d 146] [*McPeters*].) Here, ample evidence of "repeated instances of similar conduct" supported the court's determination. (*Ibid.*) Mrs. Martinez indicated that she regularly visited her daughter's apartment in the six months before the crimes and saw money stored in jars and envelopes. Lori's conduct was evidently prompted by an ongoing concern over money management and her mother's advice that she adopt a system for "segregating" funds. Contrary to what defendant suggests, evidence that Lori moved the jars from the kitchen to the bedroom a week before the murders in preparation for the victims' impending move does not negate, as a matter of law, the finding that she habitually stored money therein. (See *McPeters*, *supra*, at pp. 1166, 1178 [victim's habit of earmarking funds for certain purposes by carrying cash in envelopes].)

### 2. *Corpus delicti and sufficiency of evidence.*

 Defendant argues that evidence adduced at trial failed to establish the corpus delicti of robbery and burglary exclusive of his extrajudicial statement to Sharon admitting that he did "it" for "money." Of course, the corpus delicti rule requires only a prima facie showing that a crime occurred and does not require independent proof that the defendant was the perpetrator. (*People* v. *Wright* (1990) 52 Cal.3d 367, 403-404 [276 Cal.Rptr. 731, 802 P.2d 221].) We conclude that even in the absence of defendant's statement, there was sufficient evidence not only to satisfy the corpus delicti rule but to sustain the jury's findings that defendant murdered the Rainwaters in the course of committing a robbery and burglary.

Several facts indicated that defendant planned to rob the Rainwaters at the time he was seen entering their apartment. He knew they managed the

---

[26]Evidence Code section 1105 provides that evidence of "habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom."

complex and collected rent from the other tenants. The crimes occurred soon after the first of the month, a time when rent is commonly due. A few hours beforehand, defendant obtained the gun and duct tape that were used to subdue the victims. There was no legitimate reason for defendant to be at the victims' residence at the time.

Other evidence established that money was taken from the Rainwaters during the eight-hour ordeal. In addition to the "habit" evidence discussed above, the testimony established that four cash-filled jars and a greeting card containing six $20 bills were seen in the apartment the day before the attack began. Afterwards, no money was found in the damaged card or the two remaining jars. The jury could also reasonably infer that the victims were robbed of the "roll of bills" that Lori had attempted to use as a down payment on a new apartment earlier the same day. Defendant incorrectly suggests that a robbery cannot be found absent evidence of the precise amount possessed by the victim at the time. (See *McPeters, supra,* 2 Cal.4th 1148, 1183.)

Defendant emphasizes that crime scene investigators found money in Lori's purse ($50) and in envelopes labeled so as to suggest that the money was intended for church ($22) and collected from a tenant ($235). Defendant speculates that this was the same money that witnesses had previously seen in the baby food jars and greeting card, and that no money was therefore stolen from these two places. However, there was no evidence money was moved in the manner suggested by defendant, and such a theory seems improbable in light of Lori's careful practice of "segregating" funds. In any event, the jury could have premised its robbery determination solely on evidence that the "roll of bills" intended for the victims' new apartment was taken.

Defendant also suggests that the presence of any money in the apartment after the crimes necessarily means that none was taken. We disagree. The jury was aware of such competing inferences and presumably considered them in rendering its verdict.

The jury's robbery determination is also supported by evidence that defendant had a large and unexplained amount of cash in his possession several hours after the murders. Sharon testified that he bought cocaine from Reuben Rangel with $400 or $500 which he had not saved from past drug sales or his low-paying job. Defendant separately carried this money in an envelope—evidence linking him to Lori's habit of placing money in envelopes.

Defendant insists that Sharon's testimony about the drug deal with Rangel was "unreliable." However, the jury heard and presumably considered evidence which might bear on her credibility, including her prior criminal

history and Rangel's contradictory testimony that the transaction occurred before the Rainwater crimes. We do not find Sharon's testimony to be inherently improbable.

Finally, the jury could infer from the circumstances surrounding the shootings that the victims were killed to prevent them from escaping the scene of a violent robbery and identifying the perpetrator. Hence, defendant is incorrect in suggesting that there is no evidence to suggest the murders occurred during the commission of an underlying felony.

## I. *Reasonable Doubt Instruction*

Without objection from the defense, the jury was given the standard instruction defining "reasonable doubt" at the close of the guilt phase. (CALJIC No. 2.90 (1979 rev.); see also § 1096.) Shortly before oral argument on appeal, defendant filed a supplemental brief arguing that the instruction permitted the jury to find against him based upon a degree of proof below that required by constitutional standards of due process. (See *Cage* v. *Louisiana* (1990) 498 U.S. 39 [112 L.Ed.2d 339, 111 S.Ct. 328].) We have previously rejected similar claims (*People* v. *Noguera* (1992) 4 Cal.4th 599, 633-634 [15 Cal.Rptr.2d 400, 842 P.2d 1160]; *People* v. *Jennings* (1991) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009]), and do so again here.

## IV. PENALTY PHASE ISSUES

### A. *Validity of Prior Felony Conviction*

As noted, the prosecution introduced evidence in aggravation at the penalty phase that defendant was convicted of burglary in Texas in 1972. Defendant argues that the trial court erred in not granting his motion to strike the conviction on the ground that the record of the hearing at which he pled guilty to burglary did not show that he had knowingly and intelligently waived his jury trial, confrontation, and self-incrimination rights. (*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]; see also *People* v. *Howard* (1992) 1 Cal.4th 1132, 1175 [5 Cal.Rptr.2d 268, 824 P.2d 1315] [trial courts must "expressly advise defendants on the record of their *Boykin/Tahl* rights," and "errors in the articulation and waiver of those rights shall require the plea to be set aside only if" it was not "voluntary and intelligent under the totality of the circumstances"].) The court denied the motion to strike following an evidentiary hearing. In so doing, it implicitly rejected

defendant's claim that he never expressly waived his rights in the prior plea hearing.[27]

The record supports this determination. The prior burglary conviction is, of course, presumptively valid. (*Curl* v. *Superior Court* (1990) 51 Cal.3d 1292, 1303-1304 [276 Cal.Rptr. 49, 801 P.2d 292].) No reporter's transcript of the hearing at which defendant pled guilty apparently exists. However, a certified copy of a "Stipulation of Evidence" form personally signed by defendant, his attorney and the Texas trial judge stated, among other things, that defendant "in writing and open court . . . expressly waives the appearance, confrontation and cross-examination of witnesses . . . [and] waived [his] federal and state constitutional right against self-incrimination." Another certified document, signed in similar fashion and entitled "Waiver of Jury," stated in several places that defendant "in writing, in person, and in open court, waives his right to trial by jury" on the burglary charge. Thus, the documentary record of the prior proceeding shows an explicit and personal waiver of all three *Boykin/Tahl* rights.

At the evidentiary hearing in this case, defendant gave varying testimony in an attempt to contradict this evidence. On the one hand, he stated that "all I can remember" was the act of signing documents which his attorney said would lead to a grant of probation on the burglary charge. On the other hand, defendant purportedly recalled that his attorney never advised him of his right to a jury trial and that he never waived such right. Obviously, the trial court did not credit the latter testimony, and we defer to that determination. We see no error in the trial court's refusal to strike the prior burglary conviction on *Boykin/Tahl* grounds.

B. *Miscellaneous Instructional and Prosecutorial Misconduct Claims*

■ Defendant contends the trial court erred in rejecting his request to delete assertedly inapplicable mitigating factors from the list of sentencing factors read to the jury. (See § 190.3; CALJIC No. 8.84.1 (1986 rev.).)[28]

We have repeatedly rejected this claim. "Sentencing discretion is best guided where the jury is fully apprised of the factors which the state deems

---

[27]On appeal, defendant focuses on three constitutional rights—the privilege against self-incrimination, the right to jury trial, and the right to confront and cross-examine witnesses. In the trial court, however, defendant only challenged the adequacy of his waiver of the right to jury trial. We agree with the Attorney General that defendant has therefore not preserved any other claim. Nevertheless, as our discussion makes clear, defendant's *Boykin/Tahl* rights were not violated in any respect in the burglary case.

[28]This request was part of a broader attempt by defendant to present the jury with a modified version of CALJIC No. 8.84.1. Defendant's version substantially reworded some factors, omitted others, and purported to identify each factor's mitigating or aggravating nature. The court refused the proposed modification, and instead gave the standard instruction

relevant to the penalty determination. The jury is entitled to know that defendant's crimes lack certain characteristics which might justify more lenient treatment than other offenses in the same general class. [Citations.] The jury itself decides which of the listed factors apply in the particular case. [Citation.]" (*People* v. *Whitt* (1990) 51 Cal.3d 620, 653 [274 Cal.Rptr. 252, 798 P.2d 849].)

 Defendant next contends the prosecutor impermissibly argued that the absence of mitigating evidence in certain statutory categories was aggravating. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861] [*Davenport*].) Defendant also suggests for the first time in his reply brief that the prosecutor took an improper "arithmetical approach" towards the sentencing factors in closing argument. (See *People* v. *Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440] [*Brown*].)

Defendant's penalty trial occurred in mid-1988, after *Davenport* and *Brown* were decided. His failure to object on such grounds below waives the claims on appeal. (*People* v. *Montiel* (1993) 5 Cal.4th 877, 937 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) In any event, both claims clearly lack merit.

In discussing proposed penalty instructions with the court outside the jury's presence, counsel on both sides agreed, consistent with *Davenport*, that the mere absence of a mitigating circumstance "cannot be" considered aggravating. The prosecutor promised to adhere to this principle in argument to the jury. During closing argument, the prosecutor observed that evidence had been introduced in three potentially aggravating categories under section 190.3—factors (a) (circumstances of the crime), (b) (other violent crimes), and (c) (prior felony conviction)—and in one potentially mitigating category, factor (k) (character and background). He urged the jury to find that the remaining sentencing factors did "not apply" and that the applicable factors, once weighed, favored death. The prosecutor never said the absence of mitigating evidence in some categories was aggravating, and, instead, specifically told the jury that the opposite was true—"just because [a factor] does not apply doesn't mean it's aggravating." No violation of *Davenport* occurred.

Although the prosecutor asserted that a certain number of aggravating and mitigating circumstances were present in this case, nothing in his argument contravened *Brown* by suggesting that the appropriate penalty was to be

listing all 11 statutory factors and directing the jury to "consider" them "if applicable." For reasons explained in the text, the court did not err.

determined through mechanistic means. The prosecutor made clear that "you don't just count them up, three on the prosecution side and one on the defense side. It's not a mere counting of factors and arbitrary assigning of weights. [You are] free . . . to assign whatever moral or sympathetic value you determine appropriate to each and all of the factors." In other words, the prosecutor's argument faithfully tracked the standard post-*Brown* instructions given in this case. No misconduct of the sort urged by defendant occurred.

Defendant also avers, in passing, that the instructions failed adequately to inform the jury that it could give "independent mitigating weight to aspects of [defendant's] character and record." (See *Lockett* v. *Ohio* (1978) 438 U.S. 586, 605 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954].) Not so. As to factor (k) under section 190.3, the jury was instructed that this category includes any "circumstance which extenuates the gravity of the crime" and "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) The jury also learned that it could assign any weight to each of the factors, that a death judgment could be imposed only if aggravation substantially outweighed mitigation, and that "one mitigating circumstance may be sufficient" to impose life imprisonment even where more than one aggravating circumstance was found to exist. There was no possibility the jury misunderstood its obligation to consider defendant's character and background evidence, or believed it lacked power to spare his life on the basis of that evidence alone.

## C. *Defendant's Testimony*

Defendant insists the trial court prejudicially undermined the reliability of the penalty verdict by allowing him to testify in favor of a death sentence. He suggests no reasonable jury could independently weigh the aggravating and mitigating evidence and determine the appropriate penalty in the face of such testimony.

Defendant concedes we have previously rejected this claim (*People* v. *Guzman* (1988) 45 Cal.3d 915, 961-963 [248 Cal.Rptr. 467, 755 P.2d 917] [*Guzman*]), and we do so again here. In *Guzman*, the defendant described his life of tragedy and violent crime in great detail, and urged the jury to impose death to spare him from what he believed was an intolerable sentence of life imprisonment. This testimony was given over defense counsel's objection and in the absence of any other evidence in mitigation. In rejecting any notion that the penalty verdict was "unreliable," we reaffirmed that a competent defendant "has a fundamental right to testify in his own behalf, even

if contrary to the advice of counsel." (*Id.*, at p. 962, citing *People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710].) *Guzman* suggested that to the extent a defendant's preference for death might mislead the jury as to its sentencing responsibility, the trial court may, "in appropriate cases," inform the jury that it "remains obligated" to independently weigh aggravation and mitigation and determine the appropriate penalty "despite the defendant's testimony." (*Guzman, supra,* 45 Cal.3d at p. 962.) We held that such an instruction was not required sua sponte in *Guzman* because the jury otherwise fully understood its sentencing duty under the instructions and argument presented in that case.

Defendant attempts to distinguish *Guzman* on the ground that his testimony was uniquely "repugnant" and was purportedly calculated to "inflame" the jury. However, as *Guzman* implies, a defendant's absolute right to testify cannot be foreclosed or censored based on content. Rather, any potentially improper effect is to be alleviated with a limiting instruction where "appropriate." At defendant's request, such an instruction was given here.[29] We assume the jury followed the instruction and fully considered the penalty evidence, including the extensive case in mitigation presented by witnesses other than defendant. We therefore reject the claim that the jury's sentencing responsibility was diminished as a result of the "pro-death" testimony.

## D. *Constitutionality of the Death Penalty Law*

In his reply brief, defendant argues that the individual sentencing factors contained in section 190.3, particularly factors (a) (circumstances of the crime) and (i) (age), are unconstitutionally vague under *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130]. Defendant also claims that the statute violates *Stringer* because it does not identify which factors are aggravating and which are mitigating.

For reasons that need not be repeated, we recently rejected similar claims. (*People* v. *Bacigalupo, ante,* p. 457 [24 Cal.Rptr.2d 808, 862 P.2d 808].) *Bacigalupo* and other cases make clear that the statute adequately guides the sentencer's discretion. (See *People* v. *Montiel, supra,* 5 Cal.4th 877, 944-945; *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 595 [15 Cal.Rptr.2d 382, 842 P.2d 1142], cert. granted Dec. 6, 1993, __ U.S. __ [126 L.Ed.2d 563, 114 S.Ct. 598] (Dock. No. 93-5131); *People* v. *Noguera, supra,* 4 Cal.4th 599, 648-649; *People* v. *Proctor* (1992) 4 Cal.4th 499, 550-551 [15 Cal.Rptr.2d

---

[29]The jury was instructed in terms nearly identical to the language suggested in *Guzman, supra,* 45 Cal.3d 915, 962, as follows: "You are instructed that despite the defendant's testimony, you remain obligated to decide for yourself, based upon the factors in aggravation and mitigation, whether death is the appropriate penalty."

340, 842 P.2d 1100], cert. granted Dec. 6, 1993, __ U.S. __ [126 L.Ed.2d 564, 114 S.Ct. 598] (Dock. No. 93-5161).)

Defendant also argues that the 1978 death penalty statute is unconstitutional because it lacks certain procedural "safeguards" necessary to protect against arbitrary death judgments and ensure guided sentencing discretion. Defendant contends such safeguards include requirements that the prosecution prove the existence of all aggravating factors and the appropriateness of the death penalty beyond a reasonable doubt, and that penalty jurors agree unanimously on the presence of any aggravating circumstances. Defendant concedes we have rejected these claims before. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].) We do so again here.

E. *Proportionality Review*

Defendant asks us to undertake a comparative or intercase proportionality review as to penalty. He assumes that statistical information allegedly possessed by various federal and state agencies will show that many first degree murderers of equal or greater culpability have received sentences less than death in California and other states.

Comparative sentence review, statistical or otherwise, is not required by the federal Constitution. (*Pulley* v. *Harris* (1984) 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 40-41, 104 S.Ct. 871].) Defendant recognizes that we have also consistently declined to undertake such review under the due process, equal protection, and cruel or unusual punishment clauses of the state Constitution. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 151 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Andrews* (1989) 49 Cal.3d 200, 234 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 725-726 [248 Cal.Rptr. 69, 755 P.2d 253].) We adhere to these decisions.

However, the Eighth Amendment of the United States Constitution and article I, section 17 of the California Constitution preclude punishment that is disproportionate to a defendant's individual culpability. (*People* v. *Turner* (1990) 50 Cal.3d 668, 718 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-484 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921].) Here, in an apparent attempt to obtain drug money, defendant robbed and killed two people. The crimes involved planning, and the prolonged torment of the victims in their home with their children present. By his own account, defendant had killed before. He admitted a prior burglary-murder and three other calculated killings, and insisted he deserved death. We cannot conclude that the death penalty is disproportionate to defendant's individual culpability.

## V. DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Arabian, J., and George, J., concurred.

**MOSK, J.**, Concurring and Dissenting.—I concur in the judgment.

I generally agree with the majority's analysis. On two points, however, I must take a contrary position.

I cannot join in the majority's dictum unnecessarily "question[ing] whether records stemming from [Sharon White Bear's] voluntary treatment by . . . county therapists" at a county mental health center (maj. opn., *ante*, at p. 518) are within the coverage of *Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39 [94 L.Ed.2d 40, 107 S.Ct. 989]. That decision applies broadly to the "government" (*id.* at p. 57 [94 L.Ed.2d at p. 57])—which obviously includes agencies such as that involved here.

Neither can I join in the majority's conclusion brushing aside the serious question defendant has raised as to whether the standard instruction defining reasonable doubt derived from Penal Code section 1096 violates the due process clause of the Fourteenth Amendment to the United States Constitution.

I have long been convinced that the standard instruction is unnecessarily confusing, that it purports to define, at some length, a term—"reasonable doubt"—that numerous courts across the country have held to be self-explanatory.

In my concurring opinion in *People* v. *Brigham* (1979) 25 Cal.3d 283 [157 Cal.Rptr. 905, 599 P.2d 100], I urged the Legislature to delete the definition and to return the law to the uncomplicated state that prevailed in the period from 1850 to 1927.

Since the Legislature has not seen fit to act, I believe it is time we intervened. We should not wait for the federal judiciary to grapple with the standard instruction's potential constitutional infirmity.

**KENNARD, J.**, Concurring and Dissenting.—I concur in the majority's affirmance of defendant's judgment of conviction and sentence of death.

I dissent from that portion of the majority's opinion asserting, albeit in dictum, that a defendant in a criminal case is not "likely" to have a constitutional right to the compulsory process of the court in seeking discovery of a prosecution witness's psychiatric records that contain material information favorable to the defense but are not in the prosecution's possession. (Maj. opn., *ante*, p. 518.)

The pertinent inquiry, in my view, is not whether such records are in the possession of the government. Rather, as several decisions of the Courts of

Appeal in this state have recognized, the critical question is whether the records contain information that is favorable to the accused and material to the issue of guilt, and thus necessary for effective cross-examination of the prosecution witness whose psychiatric records are being sought. (*Rubio* v. *Superior Court* (1988) 202 Cal.App.3d 1343, 1348-1351 [249 Cal.Rptr. 419]; *People* v. *Boyette* (1988) 201 Cal.App.3d 1527, 1531-1534 [247 Cal.Rptr. 795]; *People* v. *Caplan* (1987) 193 Cal.App.3d 543, 557-558 [238 Cal.Rptr. 478]; *People* v. *Reber* (1986) 177 Cal.App.3d 523, 531-532 [223 Cal.Rptr. 139]; see also *Vela* v. *Superior Court* (1989) 208 Cal.App.3d 141, 147 [255 Cal.Rptr. 921]; *Farrell L.* v. *Superior Court* (1988) 203 Cal.App.3d 521, 527-528 [250 Cal.Rptr. 25].)

The cases I just cited acknowledge that the constitutional right of a defendant to confront and cross-examine his or her accusers is not absolute, but must be balanced against the privacy interests of the witness in the records that the defendant seeks to discover. Those interests, these authorities point out, can be safeguarded by having the trial court conduct an in camera review of the records to determine whether they contain information that is material to the defense and therefore essential to the fairness of the trial.

In this case, defendant used the compulsory process of the court in an effort to obtain from a private psychiatrist and a county mental health center all records pertaining to psychotherapy undergone by Sharon White Bear, defendant's girlfriend, before she became a key witness for the prosecution. Arguing that the psychotherapist-patient privilege (Evid. Code, § 1010 et seq.) served to protect the records, the subpoenaed parties submitted the records to the trial court under seal. After conducting an in camera review of those records, the trial court allowed defendant access to those portions of the records that were material to the defense. Because the remainder of the records contained no information favorable to defendant and material to the issue of guilt, the trial court's refusal to disclose those records did not violate defendant's constitutional rights.

Mosk, J., concurred.

Appellant's petition for a rehearing was denied January 26, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.