Filed 5/18/16  P. v. Favors CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>      v.<br><br>HAROLD PATRICK FAVORS et al.,<br><br>        Defendants and Appellants. | B261016<br><br>(Los Angeles County<br> Super. Ct. No. KA099138) |

APPEAL from the judgment of the Superior Court of Los Angeles County. Douglas Sortino, Judge.  Affirmed as to Defendant and Appellant Harold Patrick Favors. Affirmed as modified as to Defendant and Appellant Derrick Jay Jackson.

Thomas K. Macomber, under appointment by the Court of Appeal, for Defendant and Appellant Harold Patrick Favors.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Derrick Jay Jackson.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendants and appellants Harold Patrick Favors and Derrick Jay Jackson were convicted by jury of two counts of robbery.  The jury also found true several special allegations, including that the robberies were committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of Penal Code section 186.22.[1]

Defendant Jackson raises several contentions:  (1) the court prejudicially erred by admitting his confession elicited in violation of the Sixth Amendment; (2) the gang enhancement findings are not supported by substantial evidence; and, (3) his abstract of judgment contains clerical errors that must be corrected to accurately reflect the sentence imposed by the court.  Defendant Favors raises only one argument.  He joins Jackson's contention regarding the lack of evidence supporting the gang enhancement.

We affirm the convictions as to both defendants, but correct the clerical errors in Jackson's abstract of judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The charges brought against both defendants arose from robberies that occurred in 2010 at two different businesses.  The facts summarized below are taken from the joint retrial of defendants that took place in September 2014, following the granting of a mistrial in June.

### 1.     The November 2010 Robbery at the U-Haul Store.

On November 20, 2010, Lee A.[2] was working a shift, alone, at his job at the U-Haul store on Holt Street in the city of Pomona.  Sometime in the evening, his girlfriend, Wendy I., stopped by to bring him something to eat.  As she was leaving, a black female came into the store.  Wendy did not hear the woman's conversation with Lee because she was on her way out to her car.  Out in the parking lot, she noticed a light-colored or

---

[1]     All further undesignated section references are to the Penal Code.

[2]     We refer to the witnesses only by their first name and last initial to protect their privacy.

2

"champagne[-colored]" car was parked next to hers. Inside the car were three black males, all of whom turned away from her when she looked at them as she passed by.

Back inside the store, the black female asked a few questions of Lee A. about a truck rental. She then left, saying she would return later. Approximately 30 minutes later, a black male entered the store. He had a short beard and was wearing a hat and sweater. He asked if the store sold box cutters. Lee said yes, but the male was not happy with the type of box cutter U-Haul sold, so he left without buying anything.

Shortly thereafter, the black male came back into the store, accompanied by two other black males. One had a red bandana tied around his face. Another wore a baseball cap underneath a hooded jacket and was carrying a handgun. Two of the men were wearing blue latex gloves on at least one hand, and the third one was putting on a pair of latex gloves. The three men immediately approached Lee A. The one with the baseball cap pointed the gun directly at Lee. The three men were shouting at him to give them the money and one of them punched him in the face. One of the males demanded he open the safe, and when Lee fumbled with the keys, one of the others yelled to "shoot him" because he was "playing" with them.

Lee A. opened the safe and lay face down on the ground as he was ordered to do. The men also demanded the money in the cash register. Lee told them how to get the money out of the register. After taking the money, two of the men ran out of the store. One stayed behind, grabbed a trailer hitch sitting behind the counter, and hit Lee in the head, at least twice. The trailer hitch was about three feet long, was made of steel, and weighed approximately 25 pounds. Lee tried to cover his head with his hands, but then lost consciousness.

Lee A. suffered serious injuries, including head wounds requiring staples, six damaged teeth, and injuries to one hand requiring two surgeries. Lee was unable to work for three years.

Approximately $900 was taken from the store. Surveillance video from inside the store was obtained by the investigating officers. The surveillance footage showed the individual striking Lee A. with the trailer hitch several times.

3

**2.     The December 2010 Robbery at Al's Liquor Store.**

On December 28, 2010, Jamil Q. was working behind the cash register at Al's Liquor Store on Duarte Road in the city of Monrovia. Just before 9:00 p.m., three masked men walked into the store. One of the men pointed a handgun at Jamil. Another one immediately came behind the counter and punched Jamil in the face, knocking him to the ground. He got up and tried to run toward the back of the store. The man with the gun chased him down and pushed him to the floor. He held the gun in Jamil's face and told him to stay down "mother f-----." Jamil could hear the other men at the counter near the register. The men fled the store, taking the cash register, with approximately $500, along with several bottles of alcohol.

Officers from the Monrovia Police Department responded to the scene and obtained the store's surveillance video. The video showed three men, wearing ski masks, and blue latex gloves entering the store, and one of them holding a handgun. Two blue latex gloves, a broken bottle and several other items were located a short distance from the liquor store and recovered as evidence. Fingerprints could not be lifted from the blue gloves, but the gloves were found to contain DNA that matched that of defendant Favors.

**3.     The Uncharged Robbery in Apple Valley.**

On October 25, 2010, Kole H. was working his shift as a clerk at the High Desert Liquor store on Bear Valley Road in Apple Valley. His coworker, Elias N., was stocking shelves near the back. Around 9:00 p.m., Kole noticed a tan or gold-colored car pull into the parking lot. Three men entered the store, wearing bandanas tied around their faces. Kole believed they were black. One of the men had a sock pulled over one hand and a blue glove on the other. One of the other men, also wearing blue gloves, pointed a handgun in Kole's face. The men yelled at him to give them the money and get on the floor. Kole opened the register and got down on the floor. Elias struggled with one of the men. The men fled the store, taking almost $200 from the register, along with a box of rolled quarters. After the men left, Kole noticed that Elias had bruises on his face from the altercation with the robbers.

4

Deputies with the San Bernardino County Sheriff's Department responded to the scene. The deputies found a sock in the parking lot of the store and collected it for testing. The sock was analyzed and found to contain DNA that matched that of defendant Favors.

**4.      The Gang Evidence.**

Sargeant Joseph Morales, a 13-year veteran of the Los Angeles County Sheriff's Department, testified as the prosecution's gang expert. He explained his background and experience, including with the Monrovia-Duarte Gang Task Force, and his familiarity with the three predominate gangs in that area: the Duroc Crips, an African-American gang, and two rival Hispanic gangs. Sargeant Morales had previously testified as an expert on the Duroc Crips gang in approximately 10 to 12 cases.

Sargeant Morales explained gang culture generally. He said gangs spray graffiti and "tag" areas generally inside their claimed territories, but will often commit crimes outside of their territories. Individual gang members identify themselves and show allegiance to their gang by wearing colors associated with the gang, using hand signals representative of the gang's name, and having gang-related tattoos. Gang members also commit crimes, often violent crimes, to earn respect and status for themselves within the gang, to get money, and to raise the reputation of the gang as a whole. Gang members usually commit crimes with other gang members.

The Duroc Crips are a clique of the larger Crips gang. They identify with the color blue, and most members have tattoos with the letter "D" or the letters "DRC." Members of the gang often appropriate clothing with the Detroit Tigers logo bearing a stylized letter "D."

Sargeant Morales estimated he had participated in "at least 200" investigations involving Duroc Crips gang members, and had been the "handling detective" in about 75 such investigations. Based on his experience and discussions with other gang officers, he opined that the primary criminal activities of the Duroc Crips gang were robberies, murders, assaults, narcotics sales, and driveby shootings. He attested to the arrest and conviction of a Duroc Crips gang member named Adrian Tampley for possession for sale

5

of a controlled substance in 2009, as well as the arrest and conviction of another member named Nicholas Blackwell, also in 2009, for one count of murder and four counts of attempted murder.

In response to hypothetical questions based on the facts of the two robberies, Sargeant Morales opined that both robberies were committed for the benefit of, at the direction of, or in association with the Duroc Crips gang within the meaning of section 186.22. He explained the facts of the similar crimes demonstrated that three gang members were working together to commit the robberies, recover money, and were, in the parlance of gang members, "putting in work" for the gang. "It's a gang-related crime committed by gang members in association with each other to promote their own status, to enhance their own status within the gang and promote themselves within the gang."

Four deputies with the Los Angeles County Sheriff's Department testified to four separate encounters with defendant Jackson between May 13, 2007, and January 3, 2010 in which he admitted being a member of the Duroc Crips gang. Defendant said he was "jumped" into the gang at age 12. The field identification cards prepared in response to each of those encounters documented that Jackson had at least two gang-related tattoos, including "DRC" on his left arm and a "D."

A deputy with the San Bernardino County Sheriff's Department and an officer with the Ontario Police Department both testified to two separate encounters with Defendant Favors, one in 2009 and one in 2011, in which he admitted to being a 20-year member of the Duroc Crips, with the moniker "Monster Loc." It was documented in the field identification cards that defendant had a tattoo of his moniker as well as "DRC." During the 2011 encounter, Favors told the deputy that he was no longer an active member of the gang, but the deputy noted defendant was wearing all blue at the time, a color associated with the Crips gang.

5.     The Arrests and Charges.

Charges related to the robberies were initially filed against Kyle Henderson, who came to the attention of law enforcement in January 2012 as the suspect in a robbery and murder that occurred in the city of Lynwood. During the investigation of that crime,

6

Henderson, a Crips gang member, made statements incriminating himself in the November 2010 robbery at the U-Haul store in Pomona. Henderson told investigators about the robbery, that "we" did the robbery (without specifying his accomplices), that he was going to "take the fall" for them, that he wanted the death penalty, and that he was responsible for killing the U-Haul store clerk with a metal bar.

Based in part on information learned from Henderson, Detective Frederick Morse of the Los Angeles County Sheriff's Department was assigned to take over the investigation of the robberies at the U-Haul store, Al's Liquor and High Desert Liquor. It was believed the robberies were related and committed by the same three defendants, along with two female getaway drivers.

In August 2012, a felony complaint was filed in this action against Favors and two female codefendants, Rhonda Malveaux and Shantavia McDaniels. Both women pled guilty to a robbery count. Henderson brought a motion to sever the charges against him, which was granted. Henderson, Malveaux and Shantavia are not parties to this appeal.

It was discovered that Jackson was Favors's nephew. Jackson was considered a possible suspect in the robberies at the U-Haul store and Al's Liquor. He was arrested in Texas on an outstanding warrant in an unrelated matter, and booked in Los Angeles County on October 2, 2012.

On the same day he was booked in the unrelated case, Jackson was placed in a holding cell that had been wired to record audio. Deputies placed another inmate, Deshaun Jackson,[3] in the holding cell with defendant to attempt to have a conversation with him. The two spoke for several hours, during which time Jackson made various incriminating statements. Jackson identified himself as a Duroc Crip with the moniker "Lil Deek." He bragged about being involved in numerous robberies with his uncle, another Crip, and "bitches" acting as drivers. Jackson implicated himself in the robbery at the U-Haul store, exaggerating the amount of money that was stolen. He told Deshaun

---

[3] Because of the common surname, we refer to Deshaun Jackson only by his first name to avoid confusion. Deshaun and Defendant Jackson are not related.

7

he had repeatedly struck the store clerk in the back of the head with a trailer hitch. Jackson also implicated himself in the High Desert Liquor store robbery, and said he punched one of the store clerks during that incident.

An amended felony complaint was filed in this case on October 23, 2012, which added charges against Jackson for the first time.

The case proceeded to trial against Favors and Jackson on the following charges: attempted premeditated murder of Lee A. on November 20, 2010 (§ 187, § 664, subd. (a); count 1); second degree robbery of Lee on November 20, 2010 (§ 211; count 2); and, second degree robbery of Jamil Q. on December 28, 2010 (§ 211; count 3). It was alleged that all three offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1). It was further alleged that a principal personally used a firearm during the commission of each offense (§ 12022.53, subds. (b) & (e)), and that a principal was armed with a firearm during the commission of each offense (§ 12022, subd. (a)(1)). As to counts 1 and 2, it was alleged that Jackson personally used a deadly weapon and inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). As to Favors, it was alleged he had suffered three prior prison terms within the meaning of section 667.5, subdivision (b).

Trial by jury initially proceeded in June 2014. Three days into trial, the court granted a mistrial. The retrial began in September 2014. The prosecution witnesses attested to the facts stated above. The jury was also shown surveillance video of the two robberies, and heard approximately 25 minutes of Jackson's recorded conversation in the holding cell with Deshaun. Neither defendant testified. Jackson called Deputy James Boardman as his sole witness. Deputy Boardman attested to the incriminating statements made by codefendant Henderson during the initial investigation of the robberies.

## 6. The Verdicts and Sentencing.

The jury convicted Favors and Jackson of both robberies as charged in counts 2 and 3. They were unable to reach a verdict on the attempted murder charge. The court granted a mistrial on count 1. The jury found true the firearm allegations, as well as the

8

allegation that the two robberies were committed for the benefit of, at the direction of, or in association with a criminal street gang. The jury also found true the allegation that Jackson inflicted great bodily injury on Lee A. as alleged in count 2.

In a bifurcated bench trial, Favors stipulated he was the person identified in the prosecution's section 969b packet, and the court found true the allegation he had suffered three qualifying prison priors. (§ 667.5, subd. (b).)

The court sentenced Favors to a state prison term of 22 years four months, and sentenced Jackson to a state prison term of 23 years four months. This consolidated appeal followed.

## DISCUSSION

**1.     The Admissibility of Defendant Jackson's Recorded Confession.**

Jackson contends the admission of his recorded jailhouse confession to another inmate acting as an informant violated his right to counsel under the Sixth Amendment and warrants reversal of his convictions. We disagree.

It is undisputed that at the time Jackson was taken into custody in Los Angeles County on October 2, 2012, no charges had been filed against him in this case. Jackson had been arrested in Texas on an outstanding warrant in an unrelated matter. That same day, he was placed in a holding cell that had been wired to record audio with another inmate in an attempt to get him to talk. A complaint was not filed against Jackson in this case until October 23, 2012, almost three weeks after he had the recorded conversation with Deshaun. Defendant Jackson argues however that he was in custody, he was a suspect in both robberies, all of the other defendants had been arrested and charged, and the authorities intentionally delayed the filing of charges against him in violation of his rights in an attempt to get him to implicate himself in the crimes without the benefit of advice of counsel.

Defendant Jackson relies primarily on *Escobedo v. Illinois* (1964) 378 U.S. 478 (*Escobedo*) to argue that his Sixth Amendment right to counsel had attached at the time of his conversation in the holding cell on October 2, 2012, despite the fact that no charges had been filed against him. In *Escobedo*, during a custodial interrogation, the defendant

9

asked to speak with his lawyer but was denied. Even though formal charges had not yet been filed, the Supreme Court concluded he had been denied his constitutional right to counsel. (*Escobedo*, at pp. 485, 490-491.) *Escobedo* was decided before *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). The gist of Jackson's argument is that where a defendant is the focus of an investigation, the Sixth Amendment right to counsel may be triggered even before any charges have been filed against him.

In numerous post-*Escobedo* decisions, the United States Supreme Court and the California Supreme Court have consistently rejected an extension of *Escobedo* along the lines urged by Jackson.

For example, in *Moran v. Burbine* (1986) 475 U.S. 412 (*Moran*), the defendant had executed several written waivers of his *Miranda* rights, confessed, and then argued his statement was inadmissible because unbeknownst to him, his sister had hired counsel who had been trying to reach him during the interrogation. (*Moran,* at pp. 415-416.) Rejecting the defendant's suppression arguments under both the Fifth and Sixth Amendments, the Supreme Court explained: "[S]ubsequent decisions foreclose any reliance on *Escobedo* and *Miranda* for the proposition that the Sixth Amendment right, in any of its manifestations, applies prior to the initiation of adversary judicial proceedings. Although *Escobedo* was originally decided as a Sixth Amendment case, 'the Court in retrospect perceived that the "prime purpose" of *Escobedo* was not to vindicate the constitutional right to counsel as such, but, like *Miranda*, "to guarantee full effectuation of the privilege against self-incrimination . . . ." ' [Citations.] . . . *Escobedo* provides no support for [defendant's] argument." (*Moran*, at pp. 412, 429-430; see also *People v. Webb* (1993) 6 Cal.4th 494, 528 (*Webb*) [purported "prearrest right to counsel" recognized in *Escobedo* has been clarified and rejected by subsequent decisions]; and, *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 283-284 [fellow inmate and gang member wore wire to record conversation with the defendant charged on a drug offense, but not yet charged on multiple murders in which he was a suspect; incriminating statements made by the defendant to the other inmate about the uncharged murders were not elicited in violation of the Sixth Amendment because right had not yet attached].)

10

It makes no difference that Jackson was in custody in an unrelated matter or a suspect in the robberies. "[T]he Sixth Amendment right to counsel is 'offense specific'; it arises and may be asserted only as to those offenses for which criminal proceedings have formally begun. [Citations.] A defendant's incriminating statements about offenses for which he has not been charged may be admitted consistently with his Sixth Amendment counsel guarantee notwithstanding its attachment on other charged offenses at the time. [Citation.] '[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.' [Citation.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 33; accord, *McNeil v. Wisconsin* (1991) 501 U.S. 171, 175 [Sixth Amendment right to counsel "is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced"]; and, *People v. Cunningham* (2015) 61 Cal.4th 609, 648 [same].)

Jackson's argument that the investigating deputies were intentionally manipulating and delaying the filing of charges against him is also unavailing. " 'There is no constitutional right to be arrested. [Citation.] The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause . . . .' [Citation.] A contrary rule would similarly impinge upon prosecutorial discretion to decide whether and when to file criminal charges." (*Webb*, *supra*, 6 Cal.4th at p. 528.)

2.    **The Evidence Supporting the Gang Enhancement.**

Jackson and Favors both contend the prosecution failed to present substantial evidence of the "primary activities" of the Duroc Crips gang, and also failed to present substantial evidence the two robberies were committed for the benefit of, at the direction

11

of, or in association with a criminal street gang within the meaning of section 186.22. We disagree.

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.] Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) We review the whole record to determine if there is " ' "evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" ' [Citation.]" (*Ibid.*)

In establishing the primary activities of a criminal street gang for purposes of the gang enhancement statute, evidence of both past offenses by the gang's members, as well as the current charges, are relevant and admissible. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Our Supreme Court has explained that "[s]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in [*People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*)]. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See § 186.22, subd. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies. (*Gardeley*, *supra*, at p. 620.)" (*Sengpadychith*, *supra*, at p. 324.)

Here, the evidence was similar to that held sufficient in *Gardeley*. Sargeant Morales testified to his extensive experience with the Duroc Crips gang, including participation in about 200 investigations of the gang's activities. He opined that the primary activities of the gang included robberies, murders, assaults, narcotics sales, and driveby shootings, all of which are statutorily enumerated offenses. (§ 186.22,

12

subd. (e)(1), (2), (3), (4) & (6).) Sargeant Morales verified the records of convictions of two Duroc Crips gang members for narcotics sales, murder and attempted murder occurring within a couple of years of the charged offenses. The charged offenses included two robberies in which firearms were used, and an assault causing great bodily injury was inflicted on one of the victims, both statutorily enumerated offenses. We are thus satisfied the record contains solid evidence demonstrating the primary activities prong of the gang statute.

We also conclude the record contains substantial evidence that the robberies were committed for the benefit of, at the direction of, or in association with the Duroc Crips gang within the meaning of section 186.22. There are two prongs to the gang enhancement statute. The felony must be "committed for the benefit of, at the direction of, or in association with any criminal street gang," and "with the specific intent to promote, further, or assist in any criminal conduct by gang members[.]" (§ 186.22, subd. (b)(1).)

Defendants argue there was no evidence that the robbers in either incident displayed gang colors, gang signs, or yelled out any gang affiliation during the commission of the offenses. There was no evidence the money obtained in the robberies was shared with the Duroc Crips gang generally, or that they bragged about the crimes to enhance their reputation within the gang or the gang's reputation in the community. Defendants argue they are blood relatives and that, assuming they committed the offenses, there is no evidence they committed the robberies for anything other than personal gain, acting together as family members, not gang members.

It was not necessary for the prosecution to establish the crime directly benefitted the Duroc Crips gang as a whole. "Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member." (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484; see also *People v. Albillar* (2010) 51 Cal.4th 47, 60-62 (*Albillar*).)

13

Here, the evidence showed that Favors and Jackson, two self-admitted Duroc Crips gang members with multiple gang tattoos and longtime gang affiliation, acted with another Crips gang member to commit three violent robberies. In Jackson's recorded jailhouse conversation, he admitted to his gang status, and bragged about the spree of robberies, the violent assault on at least two victims, and exaggerated the amount of money that he and his accomplices recovered. One reasonable inference from such evidence is that the defendants engaged in the robberies together as gang members to increase their chance of success in completing the crimes, relying on each other's loyalty to one another as gang members, and bolstering their own individual reputations as gang members in the process. (*Albillar*, *supra*, 51 Cal.4th at pp. 62-63.) That evidence, along with the opinions of Sargeant Morales, constitutes substantial evidence defendants came together as gang members to engage in the crime spree and "thus, that they committed these crimes in association with the gang" within the meaning of section 186.22, subdivision (b)(1). (*Albillar,* at p. 62.)

**3. Defendant Jackson's Abstract of Judgment.**

Respondent concedes clerical errors in Jackson's abstract of judgment should be corrected. We agree that the abstract must be corrected to conform to the court's oral pronouncement of sentence. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070.)

In sentencing Jackson, the court imposed one 3-year consecutive term on count 2 for the great bodily injury enhancement pursuant to section 12022.7, subdivision (a). However, the abstract of judgment erroneously reflects that portion of the sentence as three 1-year terms. There is no change in the total term imposed on Jackson, but the error must be corrected to accurately reflect the sentence.

Further, the abstract of judgment includes three 1-year terms pursuant to section 667.5, subdivision (b). However, Jackson was not charged with any prison prior enhancements. Despite this error, no additional time was added in that portion of the abstract noting the total term imposed on Jackson. Nevertheless, the error must be corrected and the erroneous prison priors deleted from the abstract.

14

## DISPOSITION

The judgment of conviction as to defendant and appellant Harold Patrick Favors is affirmed.

The abstract of judgment as to defendant and appellant Derrick Jay Jackson shall be modified in the following respects:  The three 1-year terms added to count 2 pursuant to Penal Code section 12022.7, subdivision (a) shall be deleted and replaced by one, consecutive three-year term pursuant to section 12022.7, subdivision (a).  The three 1-year terms pursuant to section 667.5, subdivision (b) shall be deleted.  There is no change in the total term of imprisonment.  The superior court is directed to prepare forthwith a modified abstract of judgment in accordance with this opinion and transmit same to the Department of Corrections and Rehabilitation.  The judgment of conviction as to Defendant Jackson is affirmed in all other respects.


GRIMES, J.

WE CONCUR:


RUBIN, Acting P. J.



FLIER, J.

15